which is 25-739 in Re. Norfolk Southern. Counsel, I'll note that Judge Parker is participating on this panel, although he is not able to attend argument. He will listen to argument and participate in conference on the decision of the case with us. So, with that, Counsel Fatale. And, Mr. Fatale, am I saying your name correctly? That is correct. Thank you, Judge. And you've reserved two minutes for rebuttal, and you may proceed when you're ready. May it please the Court, my name is Al Fatale, and I represent the plaintiffs in this case, Ohio Carpenters Pension Fund and the City of Pontiac Reestablished General Employees Retirement System. This appeal's main question is, when a company operating in an inherently dangerous industry repeatedly insures investors about the safety of its business, while simultaneously slashing budgets for safety, rushing crew training, and pressuring employees to ignore mechanical defects, are those statements immaterial puffery? Can they be? If you've got a dangerous industry or everything you just said in the lead-up to that. Can statements about safety be puffery? I think it's very content-specific. I think inherent industry, the dangerous industry is part of that. I think other limiting principles would be, are they talking about it often, and is it something that investors have been paying attention to? And those are the facts here. Do I think if McDonald's talked about safety? No, I think that's a different case. So, just so I understand that principle, so any inherently dangerous industry in which aspirational statements of safety are made, any accident is then provides for actionability? At the motion to dismiss phase, yes, Your Honor. I mean, looking at what the court said in J.P. Morgan, which defendants rely on a lot, puffery is a rule that is taking an inherently fact question away from the decider of fact and being ruled or in a motion to dismiss. And it's in cases where it's so obvious that reasonable people would not feel that it was important. Here we have three judges looking at the same statements, the magistrate judge, the judge in Georgia, and Judge Kaplan, and they come to different conclusions as to the materiality of those statements. So I think at the pleading stage, when there are questions like that in this context, that it is not appropriate to dismiss for puffery grounds. I'm not saying that those elements, those limiting principles I mentioned, prove materiality. That's a question of fact that's going to have to have evidence of those factors, and I think they'd be part of it. But I don't think that at the pleading stage it is appropriate, given the context of this company, what they were saying. But wouldn't puffery, by nature, focus on things that are important to consumers and therefore to investors? For McDonald's, it would be the nutrition and the fries, and for a railroad, perhaps safety. But every industry has something that's important to their customers, and they often puff about it. Yes, Your Honor, but I think here, when looking at the statements at issue, that... Do you want to take a particular one? Yeah, sure. Statement one that we talk about, for example. Capital spending and replacement programs are and have been designed to assure the ability to provide safe, efficient, and reliable transportation systems. That, in this case, is not a vague platitude. It is a specific factual representation about how the company is allocating its resources. It describes contrary programs that are and have been designed for a particular purpose. I mean, designed to, I think, is fairly often seen as puffery in the sense of optimism and nonspecificity. So courts deal with that by then looking, are these things verifiable? They talk about verifiable facts in the puffery law. And I think here, with the facts that we have alleged, under Rule 8 Pleading Standard, unlike even 9b in the Georgia case, under Rule 8 Pleading Standards, the facts we have alleged about what was going on, on the ground, at the company, show that it was contrary to what they were representing, verifiable facts. That the maintenance budget had been cut, fired its mechanics, refused to buy replacement parts and trains. The CEO of the company himself admits that the sole focus of the company during this time period was short-term profits. That is completely contrary to what they are saying to investors on an area that was of particular interest to them and the country as a whole. Congress was having hearings on precision scheduled railroading at the time because there were concerns. This was a material issue for investors. Speaking about, so there's the puffery issue and then there's other statements that the court below found that we did not allege sufficient facts to establish falsity. Keeping in mind the Rule 8 Pleading Standard here, I think we have for training, for example, there's a statement about that they provide hands-on training and training to design to improve effectiveness and safety outcomes. The complaint alleges that the conductor training program was cut down to a six-week cram course. That the FRA, looking at Norfolk Sutherland during this time period, Norfolk Sutherland during this time period, found that the 13-day conductor classroom training window is markedly insufficient, failing to meet the complex demands of a Class 1 freight railroad operation, found that it was insufficient in structure, consistency, oversight, all leading to a heightened risk. And speaking about risk. So in terms of falsity, I mean, so that's saying there is training, right? Yes. But when they talked about the training, when they showed, this is another point that came up in the briefs, what did they have a duty to disclose? They could have said nothing about training and not have to put it in the pejorative light as they say, well, we don't have to talk about our company in the pejorative light. But when you decide to talk about these issues and the facts on the ground are different under strict liability statute like Section 11 as opposed to 10B, you're on this duty to know what the facts on the ground are. It's not knowable. There isn't intent or scienter. It's what was known or knowable to the defendant. But what I hear you saying is training was less than it should have been, could have been better, shouldn't have been cut, should have been longer. But this isn't a representation about, you know, the amount of training or the length of training. I don't, just as you just said, there is training. Is there simulation training? I don't have any reason to think there isn't simulation training, right? No. No, that is not, we do not have a factual allegation on it. It does not completely exist. But in the context of what they're saying about safety and the importantness, I think they needed to say more here. For example, Statement 7, where they talk about the board committee on safety and Judge Kaplan below said, well, it's not alleged that they didn't have the committee, so they said enough. My point is that under Section 11, when you chose to speak about the committee, you had to disclose that there wasn't money for safety improvements, that safety proposals were being rejected, that people who raised complaints were being fired or laid off, that it was necessary to not raise these issues if you wanted to be successful in the company, and the FRA's audit that identified 21 safety-related findings with 25 recommendations, which then Norfolk Southern just responded that we're going to take no further action because we're meeting the bare minimum of the regulations as it is. Your Honors? And just to note, your past time, you do have two minutes reserved.  I was about to say, Your Honors, I'm past time. Thank you. Thank you, Counsel. We'll hear from Mr. Borgiorone. Borgiorone. Bongiorno. Bongiorno. Of course. Whenever you're ready. Thank you. Good morning. May it please the Court, Mike Bongiorno from WilmerHale, on behalf of the defendants. I want to address a few things that Plaintiff's Counsel mentioned this morning with regard to the allegations and the complaint. There are certainly no allegations that there was no safety training. There's no allegation that there was no safety committee of the board. Once you allege that there's a safety committee, aren't you implying that that safety committee functions, comes up with recommendations, and the company follows them? I mean, otherwise, you lock them in a room, and what's the purpose of disclosing them in the first place? Understood, Your Honor. That's not what you heard in terms of what wasn't disclosed when the existence of a safety committee was mentioned. In response to Judge Nathan's question about that, the response was that we needed to have this right of confession, apparently, like the Donska case of this court, where we needed to now disclose everything about safety. I think I'm talking about something a lot less than the right of confession, simply that saying that you have a standing safety committee implies that you follow recommendations of it, maybe not all of them, but generally speaking. If you disclose, for example, that you have bulked up your compliance officers, doesn't that suggest that the purpose of that is additional compliance and that what the compliance officers are going to recommend are measures that the company is disposed to take? Understood, Your Honor. There's no allegation whatsoever in this complaint about what the safety committee did or did not do or that it somehow got recommendations, received information, and rejected it or ignored it. There's nothing about what happened at the safety committee here. There's nothing in the complaint whatsoever. So what you heard in response, I think, to Judge Nathan's question, was something more like, well, they said they had a safety committee. They should be talking about, you know, all of these different things that were going wrong out in the field. There's no allegation that the safety committee received reports and ignored them or anything like that. You heard about the FRA report. Obviously, that's an interim analysis. That's not something that's required to be disclosed. We cite cases, the EVAP case, the Sanofi case, et cetera, on that point. But that's more. I think they lean more on that for training than they do for the board safety committee. But there's really nothing about the ineffectiveness of the safety committee other than just this sort of general impression of, well, there was a derailment. There were safety shortfalls out in the field. That's the safety committee's fault. But there's no allegation the safety committee got a report and they ignored that report. They never met or, you know, as the court suggested, they, you know, I know it's a hypothetical. Obviously, they got locked in a room and they ignored what was going on. They're not saying that because they don't know what happened at the safety committee or didn't happen at the safety committee. That's a board. What was disclosed about the TOP program, 21? Lots, Your Honor. One of their big complaints in this case is that we cut staff. And the former employees talk a lot about how there used to be 30 people doing this. Now there are 15. We used to get X amount of time. Now we got Y. I'm not trying to, you know, marginalize those complaints. They are what they are. I understand. Some of them are people who left before the relevant period. Yeah. But the heart of the allegation, it seems to me, is that this TOP program. Yes. Sharply reduced 18 to 20% the staffing. And if that staffing that was reduced is the staff on the trains while the trains were made a mile and a half long, then it seems to me really important and may make it significant that when you read 2, 3, and 7 together, you're basically saying that the company has a fanatic devotion to safety. Sure. So a couple of things, Your Honor. One, the staffing reduction of the number you just mentioned, the court just mentioned, comes from our public disclosures about our staff reductions. So it was publicly available information. We were telling the market we're reducing staff, reducing staff. We reduce staff by 18%. You could reduce staff in the back office. It wouldn't have anything to do with safety. Sure. It would be tough for a railroad with 20,000 employees to reduce their staff by 18%. In that way, and I understand the court's question, but I think the market well understood that it wasn't a bunch of folks crunching numbers in Atlanta or Norfolk, Virginia. It was the workers that were being reduced because of what we were saying and what the PSR program is supposed to be, which is more efficient, longer trains, which means fewer trains being run because the trains are longer, so you don't need as many. So, of course, that's going to result in a reduction of staff. But I don't think that's really the weight of what they're trying to put on these three fairly discreet disclosures about training, about signage, and about a safety committee can really bear the weight of what they're trying to say here, which is that it somehow created an overall impression. There has to be a connection between the alleged misstatement and the disclosure or whatever the disclosure was and what was omitted, and they're really missing that here. They're really missing that here because what they're talking about is the three statements that are arguably, at least some of the words in them, objectively verifiable or something a reasonable investor could rely on. I don't think create quite the broad impression that the court suggested by the question. I don't think that by saying we have training programs designed to improve our safety. That is aspirational in nature. It's true, and I don't think it therefore requires, as in this court's precedent, a disclosure of every single thing that may have not been perfect with safety. The company disclosed the number of accidents it had every year. It is quite clear there are a significant number of accidents every year for a Class I railroad, and that number is disclosed. So the notion that we're now a perfectly safe company because we said we put up signs and we have a training program, I don't think that's what we were suggesting. And more to the point, you heard a few things this morning that were a little different than what you may have seen in the briefs. Sometimes you heard that whenever a company in this industry mentions safety, that that's material. That is what they said in their opening brief. That is not what they said in their reply brief. They said in their reply brief not all safety statements are material. So I'm not sure exactly what I'm fighting against here, whether it's every safety statement or only certain ones, but it goes back and forth. Well, let me ask you, I guess, the sort of inverse or flip side of that. Can safety statements, is there a context in which generalized safety statements could become actionable? Generalized? I don't think so, Your Honor. I think a general statement is a puffing statement, and I think you need to look out of circuit for something as specific at the circuit court level. But so if it's something like, well, I guess take statement one, capital spending and replacement programs are and have been designed to assure the ability to provide safe, efficient, and reliable rail transportation services, your position is that's puffery. Absolutely. If what's plausibly alleged is all, and obviously not this case, hypothetical, all budget for safety has been eliminated and all we care about is the bottom line, safety be damned, would statement one then become actionable? No. The underlying facts can't make a non-actionable statement actionable. That's very clear law. The UBS case from this circuit very clearly states that. It even goes further and says even if the statement is verifiably false, it cannot be actionable if it's immaterial, if it's puffery. And for statements like this, and I want to mention the Sixth Circuit Ford case, because that's as analogous a case as I think we have on safety at the circuit court level. There are plenty of SDNY cases that we cite in our brief that are about safety. But the Ford case, pretty sure safety is pretty important to a company that sells cars. Safety and quality, and in that case Ford said we build safety into every car, quality into every car, safety as a priority, safety as a way of life, whatever, very similar statements to what we have here. There were tires that were blowing up in hot areas like Arizona because they just weren't built properly. And the court, the Sixth Circuit, said it doesn't matter what the underlying facts are. Those statements are puffery. They can't be proven false. And I just want to mention the JP Morgan case because Council mentioned it, and that's the Second Circuit, and that's very important, and that covers a number of the statements that this court asked about this morning. In JP Morgan, again, I'm fairly certain that integrity and risk management are very important to banks. And in that case, JP Morgan was touting its integrity and its risk management and saying how important it was to the company and how great it was there. And the court said those statements are immaterial. Why? Of course they're important to banks, and of course they're important to investors. But every bank says that. And here, every railroad says a lot of the things that Norfolk Suffolk said. There are seven Class I railroads. We quote the 10Ks and SEC filings for almost all of them, and they all say basically the same thing. And that's very similar to JP Morgan talking about banks. To the extent safety is important to railroads, integrity and risk management is important to banks. Thank you, Counsel. Thank you. Mr. Vitale, you have two minutes for a vote. Thank you, Your Honors. I want to address the staffing reduction point. Disclosing a reduction in staffing is not the same as disclosing the sacrificing of safety. Rather, the impression that was given by the company's statements is that they were doing this TOPS initiative without sacrificing safety. But in reality, carmen went from 100 staff to 20. Inspection time went from three minutes a car to one minute a car. Inspections that were supposed to happen every couple thousand miles were delayed to 19,000 or 20,000 miles in violation of regulation. There was a mention of one sentence in our opening brief and one sentence in our reply brief on how we characterize what the rule on puffery and safety is. I'll go back to what I said earlier today is that there are limiting principles. I think the court should look at contact specificity and the falsity of the statement in comparison to facts on the ground. There is a difference. One last point. There is a difference between a bank talking about their compliance or their functions and a class one railroad that is required by law to reasonably carry highly dangerous chemicals through every community in America that has a rail line going through it, such as vinyl, chloride, and whatnot. It is different to investors when the sort of liabilities that would attach to a mistake in this area the company could have. Thank you, Your Honors. Thank you, counsel. Thank you to both sides for your arguments and briefs. We'll take the matter under submission and under advisement. And that concludes our argued calendar for today. So I'll ask the deputy to please adjourn court. Court is adjourned.